### In re BIRD TRUCKING COMPANY, INC., Debtor.

### BIRD TRUCKING COMPANY, INC., Plaintiff,

v.

### FORD MOTOR CREDIT COMPANY, Defendant.

Bankruptcy No. 85–01551.
Adv. No. 85–0440.

United States Bankruptcy Court,
E.D. Wisconsin.

Jan. 24, 1986.

William R. Steinmetz and Richard Carr
of Reinhart, Boerner, Van Deuren, Norris
& Rieselbach, S.C., Milwaukee, Wis., for
plaintiff.

Bryan Krakauer and Robert R. Watson of Sidley & Austin, Chicago, Ill., for defendant.

Albert Solochek of Howard, Peterman, Eisenberg, Solochek & Nashban, S.C., Milwaukee, Wis., for VTCC, Inc. d/b/a Volvo White Truck Credit Co.

Benjamin W. Laird and F. Scott Wochos of Egan & Laird, S.C., Green Bay, Wis., for Creditors' Committee.

## DECISION

JAMES E. SHAPIRO, Bankruptcy Judge.

The question presented is whether a forged or unauthorized signature, purporting to be that of an authorized representative of the purchaser, on title applications for 50 trucks, resulting in the issuance of certificates of title for these trucks with the secured party's lien upon each title, voids the lien on each title as against the debtor-in-possession.

At a trial conducted on January 8 and 9, 1986, testimony was presented and various exhibits received into evidence. Before the commencement of the trial, the parties submitted an agreed statement covering a portion of the facts. The balance of the facts were contested and were litigated at the trial.

Both parties have stressed the need for a prompt resolution of this issue in order to prevent a wasting of assets. The potential loss of a substantial nonrefundable deposit for license fees required to be paid exists, should the debtor-in-possession cease operations.

The court's decision is crucial to the destiny of plaintiff and debtor-in-possession which is Bird Trucking Company, Inc. ("Bird"). If the court renders a decision favorable to Bird, it will enable Bird to successfully resist a pending motion for relief from the automatic stay initiated by the defendant, Ford Motor Credit Company ("Ford Credit"), and allow Bird the continued use of the 50 trucks. It will also have the effect of relegating Ford Credit to the status of a general unsecured creditor with respect to these 50 vehicles—collateral that is valued at approximately $2,500,000. On the other hand, if the court renders a decision in favor of Ford Credit, a conversion of this case from a Chapter 11 to a Chapter 7 case is very possible.

On February 28, 1984, Badger Ford Truck Sales, Inc. ("Badger Ford"), a truck dealer, entered into a motor vehicle purchase agreement with Bird. This agreement embraced a sale by Badger Ford to Bird of 120 1985 Ford heavy duty tractors[1], Model LTL-9000, at a total price of $6,977,772 to be financed through Ford Credit. As part of this transaction, Bird thereafter entered into six separate installment contracts providing for the delivery of the 120 trucks at the rate of approximately 20 trucks per month over a six month period starting October, 1984 and continuing to and including March, 1985. This delivery schedule was arranged to coincide with Bird's needs and with a proposed training program Bird set up for new drivers who would be trained on these vehicles at Bird's headquarters in Waupun, Wisconsin. The agreement also specified that Bird would furnish a security interest in the trucks. Under the terms of the agreement, this security interest would thereafter be assigned by Badger Ford to Ford Credit.

The first three of these installment contracts, involving 61 trucks and covering the months of October, November and December of 1984, are in issue. Bird has challenged the perfection of the security interest on 50 of these trucks[2]. Bird alleges that Edward B. Schlagenhauf, president of Badger Ford, forged the signature of Richard Ruppert on the title applications. Ruppert, then vice president of Bird and later

---

1. The words "tractors" and "trucks", wherever used in this decision are interchangeable and shall apply to each other.

2. As they were timely retitled in Georgia more than 90 days before the filing of the Chapter 11 case, Bird has not questioned the validity of Ford Credit's security interest in the remaining 11 trucks.

its president, was duly authorized to sign on Bird's behalf. Bird further argues that because the title applications were processed with a forged signature, the security interest which Ford Credit now holds was not validly perfected and is accordingly void as against Bird, the debtor-in-possession, under the strong arm provision of § 544(a) of the Bankruptcy Code.

In order to evaluate the issues in this case, an understanding of the background of this transaction is fundamental. As previously noted, the motor vehicle purchase agreement covering the 120 trucks was entered into on February 28, 1984, by Badger Ford, as seller, and Bird, as purchaser. The authenticity of this purchase agreement has not been challenged. It is not disputed that all signatures on the purchase agreement are genuine. The parties then entered into six separate installment contracts on the following dates: October 10, November 16, and December 14, 1984 and January 16, February 12, and March 25, 1985. Each installment contract was duly executed by the appropriate parties, and there is no dispute as to the authenticity of these installment contracts.

An understanding of the procedure followed to complete the execution of the installment contracts is also critical to the disposition of this case. After the trucks had been assembled at the Ford Motor Company plant in Louisville, Kentucky, they were to be delivered to Badger Ford in Milwaukee, Wisconsin, along with a Manufacturer's Statement of Origin ("MSO") for each truck. Representatives of Bird and Badger Ford were in constant contact with each other and beginning in October, 1984, arrangements were made for Bird's drivers to pick up the trucks in Milwaukee and drive them to Waupun, in accordance with the prearranged delivery schedule.

Badger Ford prepared the title applications (Form MV–1) indicating that the lien of the secured party, Ford Credit, was to be noted on each title. After the title applications had been prepared, Schlagen-hauf processed them with the Wisconsin Department of Transportation. The initial title applications (for October, 1984) were processed "over the counter" at the Department's Madison office, with the titles being immediately prepared and given to Badger Ford at that time. The title applications for November and December of 1984, coinciding with the delivery shipments for those months, were delivered by Badger Ford to the Department's Milwaukee office, and the certificates of title were then picked up by a Badger Ford representative two or three days later. After the titles were received by Badger Ford, Schlagenhauf contacted a representative of Bird, scheduled a meeting at Bird's offices, and each installment contract was then executed. A dispute exists as to whether the titles and Bird's copies of the title applications were turned over to Bird at the time the installment contracts were executed. Schlagenhauf's testimony, denied by Bird, was that he always delivered the titles and Bird's copies of the title applications to Bird when the installment contracts were signed. Bird claims that these documents were sometimes sent to it in the mail following the signing of the contracts. In any event, it is undisputed that Bird in fact did receive and did retain all titles and all of its copies of the title applications.

On the same day that the installment contracts were signed in Waupun (by Walter Mears, then president of Bird, for the month of October and by Ruppert for the months of November and December), Schlagenhauf would deliver the documents to Ford Credit at its suburban Milwaukee office in Brown Deer, assign the particular installment contract involved and receive payment for the trucks covered under that particular installment contract.

The controversy centers around the manner in which the title applications were completed during October, November and December of 1984. Schlagenhauf has readily acknowledged that he completed the title applications and that he signed Ruppert's name under the portion of the applications to be signed by the owner. In

addition, he also wrote his own initials "EBS" next to Ruppert's name. This pattern continued throughout the entire period of October, November and December of 1984. Schlagenhauf concedes that he never obtained permission from Ruppert before signing Ruppert's name. He could not explain why he failed to seek such authorization or permission, other than to state that the prime objective of the parties was to expedite obtaining the certificates of title in order to get the trucks into operation. There is nothing in the record to indicate he would have been denied such authorization had he asked for it from Ruppert or anyone else at Bird. Schlagenhauf did state that in either November or December of 1984 he specifically told Ruppert that he had signed Ruppert's name to the applications. He said further that Ruppert did not express any opposition to this procedure, or give any instructions to discontinue such action in the future.

■■■ Whether Ford Credit holds a duly perfected security interest in the 50 trucks depends upon an interpretation of state law. The avoiding powers of a bankruptcy trustee or a debtor-in-possession as a judicial lien creditor constitute federal questions governed by § 544(a) of the Bankruptcy Code. However, the extent of the rights, remedies and powers which a trustee or debtor-in-possession any greater rights than those accorded by nonbankruptcy law. *Collier on Bankruptcy*, § 544.02 at 544–10 (15th Ed.). Because Wisconsin law is involved, this brings into focus Wis. Stats. ch. 342 and related case law.

■■■ Wis.Stats. § 342.06 spells out the requirements for completing a title application. Wis.Stats. § 342.06 requires the signature of the dealer and the Manufacturer's Document of Origin, but the statute does not specifically require the owner's signature. However, subsection (e) of § 342.06 asserts that the application can also contain:

"any further evidence of ownership which may reasonably be required by the department to enable it to determine whether the owner is entitled to a certificate of title and the existence or nonexistence of security interests in the vehicle."

Because Form MV–1 contains within it a space for the owner's signature, the court interprets this as an additional requirement to be met under § 342.06.

Wis.Stats. § 342.19 (perfection of security interests) states, under subsection (2), that a security interest:

"is perfected by the delivery to the department of the existing certificate of title, if any, an application for a certificate of title containing the name and address of the secured party and the required fee."

These requirements were met in this case. The question here presented is the manner in which the application was completed.

Wis.Stats. § 342.19(3) states that an unperfected security interest is subordinate to the rights of those persons described in Wis.Stats. § 409.301, a part of Wisconsin's version of the Uniform Commercial Code. § 409.301 specifies that a lienholder takes precedence over a person with an unperfected security interest, and §§ 544(a) and 1107(a) of the Bankruptcy Code confer the status of a lienholder on a debtor-in-possession. In the case of *In re York Chemical Industries, Inc.*, 30 B.R. 583 (Bankr.D.S.C. 1983), the court states as follows:

"A debtor-in-possession like a trustee is given the status of a hypothetical creditor who had perfected a judgment lien against the debtor on the date of the bankruptcy."

Wis.Stats. § 342.24 declares that the method provided in ch. 342 is the exclusive method for perfecting security interests. The Wisconsin cases of *Milwaukee Mack Sales v. First Wisconsin National Bank*, 93 Wis.2d. 589, 287 N.W.2d 708 (1980) and *National Exchange Bank of Fond du Lac v. Mann*, 81 Wis.2d 352, 260 N.W.2d 716 (1978) discuss the interaction of the Wisconsin Motor Vehicle Code (ch. 342) and Wisconsin's version of the Uniform Commercial Code (ch. 409), and they are relevant to this controversy. These decisions

conclude that although the creation of a security interest is governed by ch. 409, its perfection is governed exclusively by ch. 342. The court recognizes that a security interest must first be created before it can be perfected. In the case at bar, there is no issue regarding the creation of the security interest or the manner in which the security interest was created. This is what distinguishes the instant case from the facts of *Matter of Don Miller, Inc.*, 35 B.R. 714 (Bankr.E.D.Wis.1984). In *Miller, supra*, Judge Clevert held that there was no document which could serve as a security agreement, and accordingly, no security interest had ever been given. In the case at bar, a security interest was given. The crucial question before this court is whether Ford Credit's security interest was not validly perfected against Bird, as a debtor-in-possession, solely because Schlagenhauf signed Ruppert's name to the title applications without obtaining prior authorization. If the security interest was properly perfected, § 544(a) of the Bankruptcy Code and § 342.19(3) of the Wis.Stats need not be considered. These provisions take effect only after a threshhold finding has been made that the security interest itself was unperfected.

■ An examination of the 50 certificates of title reveals that Ford Credit's lien appears on each title. This is precisely what the parties intended when the title applications were processed. It serves the underlying purpose of providing notice to the public and protecting potential purchasers and lenders against any undisclosed liens. This is not a situation where titles, which issued, omitted disclosing a secured creditor's interest. What was intended to have been accomplished was done. There is no indication that anyone was harmed by the method or the manner in which the title applications were processed. In this regard, the case of *Matter of Pubs Inc. of Champaign*, 618 F.2d 432 (7th Cir.1980) is important in its holding that where creditors are in no way prejudiced, their rights should not be affected by the particular conduct involved. The only irregularity in this case was the manner in which the title applications were processed—Schlagenhauf's signing Ruppert's name to the applications.

■ Apart from the foregoing, the court is persuaded that the doctrine of ratification applies. Ratification is recognized in Wisconsin. *Matter of Estate of Alexander*, 75 Wis.2d. 168, 248 N.W.2d 475 (1977). It binds a purported principal (in this case, Bird) to an act which at the time done was unauthorized (in this case, the act being Schlagenhauf's signing of Ruppert's name on the title applications without approval). Ratification requires intention, either express or implied from the affirmative conduct of the principal. Locke, *Ratification of Forged or Unauthorized Signature*, 7 P.O.F.2d. 675, 3 Am.Jur.2d. *Agency* § 162. From the affirmative conduct of all of Bird's representatives, Ruppert in particular, it was the clear intention of Bird, as purchaser, to ratify Schlagenhauf's actions in signing Ruppert's name to the title applications.

In *Matter of Alexander, supra*, the Wisconsin Supreme Court recognized that an unauthorized signature—even when it was a forgery—was capable of being ratified. While the court in the *Alexander* case held there was no ratification (because the case did not present the proper factual setting, there being a lack of intention by the person whose signature was forged) that decision is nevertheless important in its holding that ratification can exist where the circumstances so warrant. The court concludes that the appropriate circumstances exist in this case.

It is clear from the testimony that Schlagenhauf signed Ruppert's name without first obtaining his permission. However, this was done primarily for Bird's benefit in order to expedite the process of obtaining the titles. Schlagenhauf testified that Bird was "pushing us for titles" in order to get the vehicles in service and that "it was a matter of time." Schlagenhauf's actions in placing his own initials next to the purported signature of Ruppert are not the actions of a forger. The crime of forgery

under Wis.Stats. § 943.38 requires an "intent to defraud" which is clearly lacking in this case. The court is satisfied that the conduct by Bird's officials evinces a clear intention to ratify Schlagenhauf's actions. Had Schlagenhauf contacted Ruppert at the time he signed Ruppert's name, Ruppert would have readily authorized him to do this. This conclusion is entirely consistent with Ruppert's testimony that his main concern was in getting the vehicles in operation and that he could care less who got the titles. It is reinforced by his statement to Roger Cook, supervisor of registration and fuel tax, when he said, "Get your ass in gear and get these things [trucks] licensed." In the testimony given by Cook, Mears and Joseph Pradovic, vice president in charge of maintenance, all acknowledge that the main objective was to get the trucks into operation at the earliest possible date.

The court believes that at the times the titles were turned over to Bird, or shortly thereafter, Ruppert and other Bird representatives knew that Schlagenhauf signed the title applications on behalf of Bird using Ruppert's name. Where a principal accepts property as a consequence of an unauthorized act and retains such property after discovering the circumstances without repudiating the act, this conduct indicates an intent to ratify. Locke, *Ratification of Forged or Unauthorized Signature*, 7 P.O.F.2d. at 675, 682. See also Note, *Agency—Ratification of an Unauthorized Act*, 19 S.C.L.Rev. 788.

The court specifically rejects Ruppert's contention that it was not until late August, 1985 (approximately 10 months after the initial signing) that he first learned of Schlagenhauf having signed his name. Schlagenhauf's testimony that he specifically told Ruppert in November or December of 1984 that he had signed Ruppert's name is much more plausible under the circumstances involved. Schlagenhauf was a credible witness. Even Pradovic acknowledged that he has known Schlagenhauf for over 25 years, and that Schlagenhauf's reputation was good. It is inconceivable that a transaction of this magnitude involving nearly seven million dollars and also involving a purchaser who employed experienced personnel skilled in processing title applications and one of whose employees (Cook) had the specific responsibility of maintaining titles would have ignored or overlooked how the title applications were processed unless the purchaser never really cared how the applications were processed. Moreover, the fact that Mears, Pradovic and Cook all knew that Badger Ford was titling the vehicles in Wisconsin, even though they would have preferred to have these vehicles titled in Georgia, but did nothing about it so long as it would not jeopardize getting the trucks into operation promptly is yet another indication that the manner in which the titles were obtained was really unimportant to Bird. Cook also acknowledged that he personally reviewed the title applications and placed Bird's unit numbers on all of them.

■ Even assuming for the sake of argument that the signing of Ruppert's name was not known to any of Bird's representatives until late August of 1985, Bird must nevertheless be charged with "constructive knowledge," which in itself is sufficient to invoke ratification, since Bird had ample opportunity to possess this knowledge. See *Attoe v. State Farm Mutual Insurance Co.*, 36 Wis.2d. 539, 546, 153 N.W.2d 575 (1967). See also *State v. Jefferson County Board of Adjustment*, 125 Wis.2d 387, 373 N.W.2d 450 (Wis.App.1985) at 473:

"—for reasons of policy, we attribute constructive notice of a fact to a person and treat his or her legal rights and interests as if there was actual notice, even though in fact there may be none."

and *Zdunek v. Thomas*, 215 Wis. 11 (1934) at 15, 254 N.W. 382:

"It is a general rule of law ... that whatever fairly puts a person on inquiry with respect to an existing fact is sufficient notice of that fact if the means of knowledge are at hand. If under such circumstances one omits to inquire, he is then chargeable with all the facts which,

by proper inquiry, he might have ascertained...."

The period of time which has elapsed in this case between when the title applications were first submitted and when the objection was made—approximately 10 months—is a further reason to find that ratification occurred. Courts will not permit a purported principal, after maintaining silence beyond a reasonable time, to repudiate the transaction. Note, *Agency—Ratification of an Unauthorized Act*, 19 S.C. L.Rev. 788, 791 (1967). After considering not only the amount involved but also the prejudice which would otherwise result to an innocent third party (Ford Credit) who lacked any knowledge of how the titles were obtained, 10 months is an unreasonable length of time for Bird to remain silent. Finally, the court notes that after the Wisconsin titles to the 50 trucks in dispute were obtained, they were retitled by Bird in Georgia. This is a further manifestation that Bird recognized the validity of the titles, including the procedures employed to obtain them.

In summary, Bird through its authorized officials, with the full knowledge that Schlagenhauf signed Ruppert's name, accepted and retained the benefits that resulted from the processing of the title applications when it received both the titles and vehicles. Bird waited an unreasonable length of time before voicing any objection, thereby ratifying Schlagenhauf's actions. Ford Credit had no knowledge of the manner in which these applications were processed. From the testimony presented, Bird's main objective was to get the vehicles on the road promptly, regardless of how this was accomplished. Where the result obtained met with the underlying intention of the parties (to place the lien of Ford Credit on the titles), where only the method by which the perfection was obtained is being challenged and where no one has been misled, the security interest in the trucks ought not to be declared invalid. To do so would produce an unjust result not contemplated by ch. 342 of the Wisconsin Statutes or the Bankruptcy Code.

In view of the foregoing, Ford Credit's lien covering the 50 trucks in question is held to be valid as against Bird and Bird's complaint will be dismissed.

This decision shall stand as and for findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.